UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| MAZEN ABU-HATAB, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CV-436 |
| | ) | (GUYTON) |
| BLOUNT MEMORIAL HOSPITAL, INC., | ) | |
| NASEEM H. SIDDIQI, M.D., and | ) | |
| EXTRACORPOREAL TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal

Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry

of judgment [Doc. 41]. Plaintiff Mazen Abu-Hatab, M.D., ("Plaintiff"), filed his original Complaint

in this matter on November 9, 2006, but since that time the Complaint has been both modified by

the Plaintiff and altered by the Court's dismissal of certain claims.

In his Amended Complaint [Doc. 68], the Plaintiff maintains the following claims for relief

against Defendant Blount Memorial Hospital ("BMH"): (1) retaliation for speech in violation of the

First Amendment of the United States Constitution, 42 U.S.C. § 1983; (2) deprivation of procedural

due process in violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C.

§ 1983; and (3) breach of contract under Tennessee common law. The Plaintiff's claims for relief

based upon defamation, tortious interference with a contract, unlawful procurement of breach of

contract under Tennessee Code Annotated § 47-50-109, and vicarious liability, are lodged against

Defendant Naseem Saddiqi, M.D., ("Dr. Siddiqi") and Extracorporeal Technologies, Inc., ("ETI") and do not apply to BMH.

BMH filed its Motion for Summary Judgment [Doc. 77] on November 10, 2008. The parties then submitted a Stipulation regarding the authenticity of numerous documents for the purpose of summary judgment [Doc. 81]. The Plaintiff responded to BMH's Motion for Summary Judgment on December 31, 2008, [Doc. 88], and the BMH replied to the Plaintiff's response on January 13, 2009, [Doc. 93]. BMH's Motion for Summary Judgment is now ripe for adjudication. The Court has reviewed the pleadings and memoranda submitted by the parties, and for the reasons more fully stated below, Defendant BMH's Motion for Summary Judgment **[Doc. 77]** will be **GRANTED**.

# I.      FACTS

The Plaintiff is a physician, who is duly licensed to practice medicine in the State of Tennessee and is board certified in the medical speciality of nephrology. The Plaintiff resides in Knoxville, Tennessee, and is a citizen of the state of Tennessee. BMH is a corporate entity, organized and chartered under Tennessee law and statutes for the purpose of operating a public hospital in Maryville, Tennessee.

## A.      Plaintiff's Relationship with Dr. Siddiqi and ETI

The Plaintiff received his medical staff privileges at BMH in October 1998 while working for Dr. Siddiqi's medical practice. [Deposition of Mazen Abu-Hatab, M.D., ("Hatab depo.") at 8]. At the time Plaintiff started practicing at BMH, Dr. Siddiqi had a contract with BMH to provide services, equipment and staffing for the hospital's dialysis clinic. [Deposition of Samuel D. Evans, M.D. ("Evans depo.") at 24]. Dr. Siddiqi also served as the medical director of the BMH dialysis

unit and, Plaintiff alleges, exercised dominion and control over policies, procedures, and discipline in the dialysis unit. [Doc. 68 at 3].

In 1999, the Plaintiff left Dr. Siddiqi's practice and began his own practice. [Hatab depo. at 9, Doc. 68 at 4]. During 2000, 2003, and 2004, the Plaintiff made repeated requests to BMH's administration and medical staff to discontinue contracting with Dr. Siddiqi and make other arrangements to maintain the dialysis unit. [Hatab depo. at 16-17]. In the spring of 2000, representatives of BMH and members of the medical staff leadership met with the Plaintiff and discussed contracting with a provider other than Dr. Siddiqi to supply dialysis services at BMH. [Hatab depo. at 18-22]. After entertaining the suggestions, BMH responded that its need for dialysis services was currently being met under the contract with Dr. Siddiqi. [Evans depo. at 49].

In August 2004, the Plaintiff made a presentation about concerns he had regarding Dr. Siddiqi's competing nephorology group providing the dialysis services, but the Plaintiff was absent when the Medical Department reconvened with BMH's administrator to address the concerns about the dialysis contract on October 27, 2004. [Hatab depo. at 43-44]. BMH's administrator explained the feasibility of obtaining an alternate contract or arrangement and stated BMH had concluded it was in its best interests to continue to contract with Dr. Siddiqi for the dialysis services. [Deposition of Taylor Weatherbee, M.D., ("Weatherbee depo.") at 154-56].

The Plaintiff maintains that after he left Dr. Siddiqi's practice Dr. Siddiqi threatened to make sure the Plaintiff's practice failed. The Plaintiff also alleges that he was "subjected to an openly hostile environment" in the dialysis unit created by nurses employed by ETI, a corporate entity for which Dr. Siddiqi serves as president, medical director, and registered agent. [Doc. 88 at 2-3, Doc. 66 at 2]. BMH agrees that problems began to arise between the Plaintiff and the dialysis unit staff

after the Plaintiff left Dr. Siddiqi's practice, but BMH maintains that these were problems brought about by the Plaintiff's unprofessional behavior. [Doc. 80 at 4].

**B.      Plaintiff's Professional Issues at BMH**

In the spring of 2000, BMH's medical staff leadership, administrators, and members of the Blount Memorial Hospital Board of Directors ("Board of Directors") met with the Plaintiff on several occasions to discuss the problems the Plaintiff and the dialysis unit nurses were having while working together in the unit. [Hatab depo. at 13-14]. Timothy Thurston, M.D., ("Dr. Thurston"), BMH's Chief of Staff at the time, also wrote the Plaintiff a letter on May 30, 2000, which expressed concern about the Plaintiff's unprofessional interactions with the dialysis nurses and his refusal to work with one of the nurses. [Doc. 80-3 at 56-58]. In an effort to convey the gravity of the situation, Dr. Thurston explained to the Plaintiff that, to his knowledge, BMH had never had physician behavior necessitate a meeting involving physician representatives of the medical staff, the hospital administrator, and the Chairman of the Board of Directors. [Doc. 80-3 at 57]. He further explained:

> Each of us present at the meeting following your expression of concerns [regarding Dr. Siddiqi and the nurses employed by ETI] indicated that we felt that your action represented behavior totally unacceptable under <u>any</u> circumstances in this hopital. There can be no justification for [demonstrating a] lack of respect or courtesy with hospital employees . . . (regardless of how you may think they feel about you). The most serious of concerns relate to your refusal to participate in the care of a patient for whom you were the physician. This not only puts the patient's health at risk but also shows a serious disrespect for your fellow colleagues, for the nursing staff and for the patient's family.

[Doc. 80-3 at 57]. The Plaintiff acknowledged receipt of the letter from Dr. Thurston on June 4, 2000, by his signature at the bottom of the letter. [Doc. 80-3 at 57].

4

The problems between the Plaintiff and the nurses continued and on December 22, 2000, BMH Administrator Joseph M. Dawson, ("Mr. Dawson") and Chief of Staff Marvin Beard, M.D., ("Dr. Beard") sent the Plaintiff another letter ("First Code of Conduct Letter") outlining BMH's concerns about violation of hospital policy. The letter stated:

> You are by way of this letter and by the meeting with Marvin Beard, M.D., Chief of Staff, Alan Smuckler, M.D., Chairman of Medicine, and Mark Green, M.D., Vice-Chair of Medicine, on December 22, 2000 warned that your continued membership and privileges are contingent upon conducting yourself professionally and courteously.

> Specifically:

> 1.  You must treat all hospital staff and support staff in a courteous, respectful and professional manner. This means that you shall not raise your voice, demean, belittle or berate any staff member or support service provider.

> 2.  You must discuss your assessment and plans of care of your patients with the hospital staff assisting you, especially the dialysis nurses.

> 3.  You must not intimidate hospital personnel by physical touching.

> 4.  Any complaint or concern about any nursing personally shall be reported in writing to that individual's supervisor with a copy to the Administrator. Any complaint or concern about scheduling, equipment or any other hospital matter must be in writing directed to the Administrator. . . .

> 5.  You shall not make comments or entries into the Medical Record regarding your perception of negative events of patient services or treatment. The medical record shall contain only information about the patient's condition and care. . . .

> 6.  You must not engage in any retaliatory or abusive conduct with respect to any individual who has filed in the past, or may file in the future, a complaint or concern regarding you. . . .

5

7.  You must understand that any confirmed violation of the above conditions or other inappropriate behavior shall result in:
    a. an immediate 14-day suspension of privileges
    b. any subsequent violation, an immediate 29-day suspension will be imposed
    c. any further violations may result in consideration of revocation of your membership and privileges

8.  In addition, you shall remain subject to and agree to abide by all requirements applicable to other Medical Staff members at the Hospital including, but not limited to the ByLaws, Rules and Regulations, Credentialing Plan, etc., of the hospital and medical staff, and you must agree that any violation of the same shall result in possible suspension or other actions deemed appropriate.

[Doc. 80-3 at 61-62]. The Defendant also acknowledged receipt of this letter by his signature at the bottom of the letter. [Doc. 80-3 at 62].

On May 24, 2001, Plaintiff's privileges at BMH were suspended for fourteen days for violations of the conditions of the First Code of Conduct Letter, specifically, Plaintiff's continued inclusion of his perception of services or treatments in medical records. [Doc. 80-3 at 126-27]. At this time, Plaintiff's conduct was reported to the Blount Memorial Hospital Medical Executive Committee ("MEC"), pursuant to Section 3.C.2 of the Blount Memorial Hospital Credentials Procedure Manual ("Credentials Manual"), so that the MEC could consider initiating a formal investigation of the concerns about the Plaintiff's behavior.

The MEC appointed a task force consisting of three doctors who had no previous involvement in the collegial attempts at resolution. The MEC reviewed and discussed the task force's report, and after its meeting on May 31, 2001, the MEC sent the Plaintiff a letter summarizing its impression and the need for the Plaintiff to change his behavior. ("Second Code

of Conduct Letter") [Doc. 80-3 at 63-66]. The MEC stated that it was especially concerned about the Plaintiff's failure to change his behavior in light of:

> (1) multiple counseling sessions over the last several years involving Medical Staff leaders, the Chief Executive Officer, and even the Chairman of the Board; (2) your conditional reappointment in August 2000 to stress the importance of your conducting yourself in an appropriate manner; and (3) the detailed code of conduct that was developed for you in December 2000.

[Doc. 80-3 at 63]. The letter expanded upon the requirements developed for the Plaintiff in the First Code of Conduct Letter by requiring that the Plaintiff: refrain from public derogatory comments about the quality of care provided by BMH, its staff, and physicians; report and discuss any problems or concerns with Dr. Elizabeth LeBrun, the Vice Chief of Staff; participate in a constructive and professional manner in a meeting with Dr. Siddiqi, the nurses, the blood bank, and laboratory staff to develop standing orders for in-hospital plasmaphoresis and dialysis; and obtain professional counseling in order to help address interpersonal difficulties with other physicians and nursing personnel. The letter concluded by stating that violation of these or other BMH policies would result in an immediate twenty-nine day suspension of the Plaintiff's privileges and could led to revocation of his privileges. The Plaintiff acknowledged receipt of this letter on June 22, 2001, by his signature at the bottom of the letter.[1]

The Plaintiff was approved for a one year conditional reappointment for a term running from August 31, 2001, to August 31, 2002. In a letter acknowledging the Board of Directors' decision to extend this offer, Mr. Dawson and Dr. Beard reiterated the conditions and requirements

---

[1]The Plaintiff noted by his signature that he agreed to abide by these conditions and intended to be legally bound subject to terms and conditions contained in a June 12, 2001, letter which he had attached as Exhibit A. This Exhibit A was not filed with the Court.

7

previously discussed in the First and Second Code of Conduct letters remained in effect. [Doc. 80-3 at 67]. During this conditional reappointment, problems arose again, [Hatab depo. at 30-31], and on February 7, 2002, Dr. Beard sent a letter to the Plaintiff highlighting the problems, including characterizing "chronic" patients as "acute" patients in violation of dialysis protocols. [Doc. 80-3 at 68-69]. The letter explained that the MEC sought to resolve the issue through collegial efforts and would delay a twenty-nine day suspension, even though such suspension was appropriate under the conditions, but implored the Plaintiff to conform his behavior as it was "truly [his] last chance." [Doc. 80-3 at 69].

The conflicts between the Plaintiff and other hospital and medical staff continued during 2002, 2003, and 2004, [see Weatherbee depo. at 119-20; Deposition of Elizabeth "Liddi" Berry, R.N., ("Berry depo.") at 37-38, 53-56, and 90-92; Deposition of Debra Griffin, R.N., ("Griffin depo.") at 22-28, 31-32, 37-38, 40, 48-49, 59-62, 64-68, 72, 75-77, 79, 93-94, and 98-99).

On October 29, 2004, Dr. Weatherbee prepared a memorandum summarizing a number of the Plaintiff's recent violations of hospital policy, based in part on a letter that Debra Griffin, R.N. had composed earlier in the year. [Weatherbee depo. at 120-21]. Based upon the Plaintiff's continuing non-compliance, the MEC decided at its November 4, 2004, meeting that a twenty-nine day suspension of the Plaintiff's privileges was necessary. On November 10, 2004, the Plaintiff, Dr. Weatherbee, and Dr. Coleman met to discuss recent problems and concerns. [Weatherbee depo. at 119-23].

On November 11, 2004, Dr. Weatherbee sent the Plaintiff a letter summarizing the discussions from the meeting and explaining, "[i]n accordance with the February 7, 2002 letter, the MEC determined to initiate the 29-day suspension of your clinical privileges, pending our discussion

8

with you to obtain your perspective on these matters." [Doc. 80-3 at 86]. The letter also informed the Plaintiff that the MEC had formed an ad hoc Investigating Committee ("Investigating Committee") to which Matthew McCarty, M.D., ("Dr. McCarty"), James Milhollin, M.D., ("Dr. Milhollin"), and Matthew J. McCarty, M.D., ("Dr. Beard"), had been appointed. The letter stated that this committee would determine whether any action beyond the twenty-nine day suspension was necessary and a copy of Article 3.C of the Credentials Manual [Doc. 80-3 at 94, 96-100], which details the scope of the committee's authority and the procedure for determining the necessity of a suspension of a physician's privileges was attached.

On February 8, 2005, the Investigating Committee sent the Plaintiff a memorandum outlining the issues that would be discussed at a meeting to be held on February 11, 2005. [Doc. 80-3 at 109; Hatab depo. at 56]. Specifically, the committee sought to discuss: communication with nursing staff; therapeutic aims of dialysis, dialysis techniques, and care of patients while on dialysis; frequency and duration of dialysis for in-patients and out-patients; and hospital policy and procedures including hepatitis and HIV screenings for all patients, scheduling hemofiltration, scheduling for chronic dialysis, and the Plaintiff's availability and response to pages. [Doc. 80-3 at 109]. After the meeting, Dr. McCarty composed a two page summary of this meeting which included both the hospital and the Plaintiff's perspective on each of the issues. [Doc. 80-3 at 110-11].

On February 24, 2005, the MEC notified the Plaintiff via certified mail that pursuant to Section 3.C of the Credentials Manual it had recommended that the Plaintiff's privileges be permanently revoked. [Doc. 80-3 at 112]. The letter stated that this recommendation was based upon the Plaintiff's "multiple violations of hospital policy, a pattern of inappropriate conduct, and

9

the failure of all previous collegial, education, and disciplinary actions to correct these problems." The letter informed the Plaintiff that a precautionary suspension would start March 3, 2005 and was to remain in effect until the completion of peer review. The letter also informed the Plaintiff that pursuant to Section 4.A.1 of the Credentials Manual he was entitled to request a hearing before the MEC's recommendation was acted upon by the Board of Directors. A copy of Article 4 of the Manual, which outlined the procedure for such a hearing and the appeals procedure, was enclosed with the letter. [Doc. 80-3 at 114-25].

On March 11, 2005, the Plaintiff, via counsel, requested a fair hearing.[2] [Doc. 81-3]. BMH selected a Fair Hearing Panel ("the Panel") and sent the Plaintiff a letter informing him of the panel members' names, employers, and addresses. [Doc. 81-4]. In a letter dated April 4, 2005, the

---

[2] The term "fair hearing" is used to describe the hearing and procedure generally employed in the medical field to afford a physician due process prior to his or her medical privileges being revoked or suspended for a significant period of time. In this case, Article 4 of the Blount Memorial Credentials Manual outlines when a hearing is appropriate, how it should be conducted, and by whom. The Credentials Manual instructs that, at the fair hearing both parties have the following rights, subject to reasonable limits determined by the presiding officer: (1) to call and examine witnesses to the extent available; (2) to introduce exhibits; (3) to cross-examine any witness on any matter relevant to the issues and to rebut any evidence; (4) representation by counsel who may call, examine, and cross-examine witnesses and present the case; and (5) to submit a written statement at the close of the hearing. Credentials Manual § 4.C.5(a).

After hearing the evidence presented, the Fair Hearing Panel makes a recommendation to the Blount Memorial Hospital Board of Directors based upon: (1) oral testimony of witnesses; (2) memorandum of points and authorities presented in connection with the hearing; (3) any information regarding the individual who requested the hearing so long as the information has been admitted into evidence at the hearing and the person who requested the hearing had the opportunity to comment on and, by other evidence, refute it; (4) any and all applications, references, and accompanying documents; (5) other documentary evidence, including medical records; and (6) any other evidence that has been admitted. Credentials Manual, § 4.D.2.

Thereafter, and consistent with the burden on a physician to demonstrate that he or she, on a continuing basis, satisfies all criteria for clinical privileges, the panel shall recommend in favor of the determination previously made by the Medical Executive Committee, a smaller reviewing committee made up of other physicians, unless it finds that the physician has proved by a preponderance of the evidence that the unfavorable recommendation was arbitrary and capricious.

10

Plaintiff objected to three of the four panel members, all of the panel members who were medical doctors, based upon personal connections to BMH medical staff and contractual agreements that could lead to conflicts of interest. BMH replaced two of the said physicians. The third, John Pittenger, M.D., ("Dr. Pittenger"), remained on the Panel. Dr. Pittenger had contractual ties to the hospital. BMH, however, found that because Section 4.B.5(a) of the Credentials Manual stated that "contractual agreement with, [BMH] shall not preclude an individual from serving on the Panel," replacement was not warranted. The Plaintiff again objected to the panel members, [Doc. 81-8], and the presiding panel member, attorney Robert Knolton, interviewed the panel members and determined they did not hold prejudices that would prevent a fair hearing, [Doc. 81-8, 81-12]. Based on this evaluation, BMH denied the Plaintiff's second request to replace the panel members.

On April 15, 2005, BMH sent Plaintiff's counsel the Plaintiff's entire credentials file, the Plaintiff's entire quality file, and all of the minutes of the MEC, credentials committee, physician performance improvement committee, and the department of medicine that referred to the Plaintiff. BMH also enclosed copies of the Credentials Manuals that had been in effect during the Plaintiff's tenure and the BMH policies and guidelines relating to nephrology. [Doc. 81-7]. On May 26, 2005, BMH, via counsel, sent Plaintiff's counsel a letter stating the time, date, and location of the hearing and providing the Plaintiff with the name and one paragraph summarizing the background and expected testimony of each of the fifteen witnesses BMH expected to call at the hearing. [Doc. 81-10]. The letter also asked that Plaintiff's counsel disclose the exhibits and witnesses the Plaintiff wished to present on his behalf at the hearing as soon as possible.

After a nurse complained to BMH administrators about being contacted at work regarding being a witness for the Plaintiff, BMH's counsel suggested that the Plaintiff tell BMH the personnel

he wished to contact about testifying. BMH then would advise the employee that the Plaintiff

wished to call him or her as a witness. [Doc. 81-11]. The Plaintiff's contact with nurses who were

potential witnesses was conducted through this procedure. [Docs. 81-13, 81-14].

A fair hearing was conducted on August 30, 31, and September 1, 2005, and the Panel heard

thirty-three hours of testimony from twenty-five witnesses, including the Plaintiff. On November

9, 2005, the Panel unanimously recommended that the MEC's recommendation be affirmed,

explaining:

> We conclude from the evidence presented that Dr. Hatab was given
> many warnings, numerous specific guidelines and multiple
> opportunities to change his behavior but that he was unable or
> unwilling to make meaningful changes on any consistent or long
> term basis.
>
> We conclude from the evidence we were given that the medical staff
> did its very best to help Dr. Hatab learn to function amicably and
> effectively in the hospital setting. We note that an enormous amount
> of precious time and energy was invested in this matter by at least
> three Chiefs of Staff and by many other members of the medical
> staff over a period of several years but to no avail.
>
> We acknowledge that the process of attempted intervention by the
> medical staff was not perfect, but we assert that these efforts went
> far beyond what would be considered fair and reasonable. These
> attempts were made by clinicians who are not professional
> counselors or attorneys but who did their best to help Dr. Hatab,
> their colleague, to care for his patients and to work smoothly with
> nurses, pharmacists, and other vital members of the health care team.
>
> We deeply regret the effect that this controversy has had, and
> continues to have, on Dr. Hatab's life and his practice. We consider
> him to be a very capable and compassionate physician. This
> committee does not question or impugn the medical skills or the
> clinical judgment of Dr. Hatab based upon the evidence of this
> proceeding. However, in weighing all the evidence that was
> presented, we find we must recommend in favor of the Medical
> Executive Committee's action.

[Doc. 81-17 at 3].

Thereafter, the Plaintiff appealed the Panel's decision to the full Board of Directors, pursuant to Section 4.E of the Credentials Manual. On January 19, 2006, all nine members of the Board of Directors convened for an appeals hearing.[3] [Doc. 81-18 at 1]. Each party was represented by counsel and each submitted a written statement of their position, which were provided to the Board members along with the Panel's decision. The record from the fair hearing was made available to the Board of Directors, and neither party offered new evidence at the hearing. Each party made a twenty minute oral argument that was followed by a period for questions. The Board of unanimously concluded that "the MEC, including its Investigating Committee, the Panel, and the Appellate Review Panel, acted appropriately and reasonably, that the procedures as set forth in the Credential Procedure Manual were carefully followed throughout this process, and that the recommendations of these groups to the Board were not made arbitrarily, capriciously, or without prejudice, but were in fact made upon substantial and credible evidence." [Doc. 81-19 at 4].

After the Board affirmed and adopted the Panel's decision, the Plaintiff filed the Complaint [Doc. 1] in the instant action on November 9, 2006.

## II. STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must demonstrate no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323

---

[3] While the section 4.E procedure allowed the chairperson of the Board of Directors to choose an appellate panel to hear the appeal and submit a report and recommendation to the full panel, the Board of Directors decided that the full board would sit to hear the appeal.

(1986); Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). That is, the moving party must provide the grounds upon which it seeks summary judgment, but does not need to provide affidavits or other materials to negate the non-moving party's claims. Celotex, 477 U.S. at 323.

The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Nat'l Satellite Sports, Inc. v. Eliadis Inc., 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, and must submit significant probative evidence to support its claims. Celotex, 477 U.S. at 324; McLean v. Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. Celotex, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986); Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. ANALYSIS

The Plaintiff's remaining claims against BMH are for breach of contract under Tennessee common law, retaliation for speech in violation of the First Amendment of the United States Constitution, and deprivation of procedural due process in violation of the Fourteenth Amendment to the United States Constitution. BMH moves for summary judgment in its favor on these claims.

## A. Breach of Contract

The Plaintiff's first claim against BMH is for breach of contract under Tennessee common law. BMH argues that there is no genuine issue as to material fact and it is entitled to judgment as

14

a matter of law because it is immune from damages pursuant to the Health Care Quality Improvement Act, 42 U.S.C. §§ 11111(a)(1), 11112(a) and that it is immune from damages pursuant to the Tennessee Peer Review Law, Tenn. Code Ann. § 63-6-219. Alternatively, BMH argues that it is entitled to summary judgment because it substantially complied with its contractual obligations to the Plaintiff under the BMH Credentials Manual.

*1.*        *Health Care Quality Improvement Act*

The Health Care Quality Improvement Act ("HCQIA") was passed in 1986 to provide for effective peer review and interstate monitoring of incompetent physicians, and to grant qualified immunity from damages for those who participate in peer review activities. Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461 (6th Cir. 2003); Austin v. McNamara, 979 F.2d 728, 733 (9th Cir. 1992). If a "professional review action" satisfies the requirements of HCQIA then the persons and entities participating in the review "shall not be liable for damages under any law of the United States or of any State . . . with respect to the action." 42 U.S.C. § 11111(a)(1). Specifically, a professional review body, which includes a "health care entity and the governing body or any committee of a health care entity which conducts professional review activity," 42 U.S.C. § 11151(11), and any person acting as a member or staff to the body are immune from damages. 42 U.S.C. § 11111(a)(1).

1.        The Suspensions and Revocation of the Plaintiff's Privileges were a Professional Review Action

A "professional review action" is an "an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect)

adversely the clinical privileges, or membership in a professional society, of the physician.  Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action."  42 U.S.C. § 11151(9).

The suspensions of the Plaintiff's privileges and the ultimate revocation of the Plaintiff's privileges were actions taken in the conduct of professional review activity, which were based upon the Plaintiff's professional conduct and affected the Plaintiff's clinical privileges, and accordingly, all the actions by BMH were "professional review actions," as defined in HCQIA, and are subject to HCQIA's provisions.

2.      Presumption that the Professional Review Action was Reasonable and Adequate Under HCQIA, 42 U.S.C. § 11112(a)

In order to qualify for immunity, a professional review action must be taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

16

42 U.S.C. § 11112(a). However, "a professional review action shall be presumed to have met the preceding standards . . . . unless the presumption is rebutted by a preponderance of the evidence." § 11112(a).

Thus, the HCQIA creates a rebuttable presumption of immunity, forcing a plaintiff to prove that the defendant's actions did not comply with the relevant standards. Meyers, 341 F.3d at 467-68. This presumption creates an unusual summary judgment standard that the Court of Appeals for the Sixth Circuit has recognized can be stated as: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the [defendant's] actions are outside the scope of § 11112(a)?" Id. (citing Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1333 (11th Cir. 1994) (quoting Austin, 979 F.2d at 734)). "This inquiry as to the reasonableness of a defendant's actions is an objective test; the question is whether there was a sufficient basis for the defendant's actions. 'Bad faith' arguments are immaterial to this objective standard." Stratienko v. Chattanooga-Hamilton County Hosp. Auth., 1:07-CV-258, 2008 WL 4191275 (E.D. Tenn., Collier, C.J., 2008) (citing Austin, 979 F.2d at 734).

a.      Reasonable Belief that the Action Was in the Furtherance of Quality Health Care

The first prong of 42 U.S.C. § 11112(a), is satisfied if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." Bryan, 33 F.3d at 1323 (citing H.R.Rep. No. 903, at 10, reprinted in 1986 U.S.C.C.A.N. at 6392-93). It is an objective standard, rather than a subjective good faith requirement. Id. (citing Austin, 979 F.2d at 734). The HCQIA does not require that the professional review result in actual improvement in the quality of health care, but only that it was undertaken in the reasonable belief that quality health care was being

17

furthered. <u>Meyers</u>, 341 F.3d at 468 (citing <u>Imperial v. Suburban Hosp. Ass'n, Inc.</u>, 37 F.3d 1026, 1030 (4th Cir.1994)).

The Plaintiff argues that "a genuine issue of material fact exists as to whether [BMH] took the action—including the initial summary suspension—without true evidence of actual threat of patient harm." [Doc. 88 at 40]. While the Plaintiff makes a vague cite to BMH's contractual obligations, the Plaintiff presents no specific evidence to support his contention that a genuine issue of material fact exists as to whether a reasonable jury could find, by the preponderance of the evidence, that BMH acted without a reasonable belief that their action would protect patients.

The evidence in the record conclusively demonstrates that the MEC's decisions, the Panel's decision, and the Board's decision were made in a reasonable belief that they were furthering quality health care, and no reasonable jury could find otherwise. BMH spent dozens of hours in meetings with the Plaintiff and gave the Plaintiff documents—letters, memorandum, and minutes—explaining BMH's concerns and how these issues could be addressed to prevent disruption to hospital functions and patient care. Further, the information available to BMH, and its decision-making entities, at the time of the professional review action, support a reasonable conclusion that the action would protect patients. [<u>See</u> Weatherbee depo. at 132-34 (explaining that the MEC felt the unreturned pages, staff interaction, and issues with response to requests from the pharmacy put patients at risk of harm)]. Even taking the facts in the light most favorable to the Plaintiff and assuming that the Plaintiff's allegation that, basically, the entire BMH administration and medical staff were conspiring with Dr. Siddiqi and the dialysis nurses is true, the Board, the Panel, and the MEC upon reviewing the evidence presented to them could have reasonably concluded that their action would restrict incompetent behavior or would protect patients.

18

The Court of Appeals for the Sixth Circuit, when faced with a similar argument "that genuine issues of fact exist regarding the veracity of the underlying allegations," in a medical privileges case, explained that review under 42 U.S.C.§ 11112(a)(1) "is not directed at whether each of the complaints were undisputedly true, but whether Defendants acted reasonably in considering and relying on them." Meyers, 341 F.3d at 468 n. 5. Plaintiff has presented no evidence that would undermine the rebuttable presumption that BMH operated with a reasonable belief that it would curtail the Plaintiff's disruptive behavior and, thereby, protect patients. Bryan, 33 F.3d at 1323. Accordingly, the Court finds a jury could not conclude, by a preponderance of the evidence, that BMH and its reviewing components—the Board, the MEC, and the Panel—acted other than on a reasonable belief that it would protect patients.

b.      Reasonable Effort to Obtain the Facts of the Matter

The second prong of 42 U.S.C. § 11112(a) requires that the reviewing entities make a reasonable effort to obtain the facts of the matter. In addressing this requirement in Meyers v. Columbia/HCA Healthcare Corp., the Court of Appeals for the Sixth Circuit found the district court's granting of a motion for summary judgment to be appropriate where the plaintiff doctor was: investigated by a credentials committee, a MEC, and a committee of three Board members; represented by counsel; and given the right to confront witnesses. The court found his "conclusory statements attacking individual items of evidence" did not rebut the presumption that the professional review was made in accordance with § 11112(a)(2) and did not create a genuine issue of material fact.

Here, the Plaintiff also seeks to create an issue of material fact by attacking particular pieces of evidence, which are largely unrelated to the decision that his uncooperative behavior, not the

19

quality of his care, put patients at risk. The Plaintiff argues that the investigating entities merely accepted the accounts and complaints of peers and colleagues as true without sufficient investigation. This cursory accusation without specific argument or citation does not create an issue of material fact in the face of the rebuttable presumption and the voluminous evidence detailing BMH's ongoing and thorough efforts to investigate the allegations against the Plaintiff.

In 2001, BMH first had its Chief of Staff, Dr. Thurston, investigate the allegations. Dr. Thurston then held a meeting with Dr. Beard, Dr. Weatherbee, Mr. Dawson, Mr. Redwine and the Plaintiff to discuss the behavior issues. Finally, the matter was turned over to the MEC who investigated the matter before issuing the first suspension.

Prior to the second suspension, in January and February 2002, Dr. Beard and the MEC investigated allegations of violations of dialysis protocol and other policies, and in late October and early November of 2004, the MEC appointed the Investigating Committee to look into concerns and complaints about the Plaintiff's professional conduct and patient care practices. The Investigating Committee held a meeting to discuss its findings and submitted a confidential peer review document with the conclusions from its investigation. And before revoking the Plaintiff's privileges, the Panel heard thirty-three hours of testimony from twenty-five witnesses at a fair hearing which took three days.

In light of BMH's thorough and well-documented investigation, the Court finds that the Plaintiff is unable to rebut the presumption that BMH and its reviewing entities made a reasonable effort to obtain the facts of the matter. The Court finds a jury could not conclude, by a preponderance of the evidence, that BMH and its reviewing components—the Board of Directors, the MEC, and the Panel—failed to make a reasonable effort to obtain the facts of the matter.

c.      Adequate Notice and Hearing Procedures

The third prong of 42 U.S.C. § 11112(a) requires that the reviewing entities take a review

action only after "adequate notice and hearing procedures are afforded to the physician involved or

after such other procedures as are fair to the physician under the circumstances."

i.      Adequate Notice

The HCQIA provides a "safe harbor" provision by which the notice requirement may be met,

which is as follows:

> (b) Adequate notice and hearing
>
> A health care entity is deemed to have met the adequate notice . . .of
> this section with respect to a physician if the following conditions are
> met (or are waived voluntarily by the physician):
>
> (1) Notice of proposed action
>
>> The physician has been given notice stating--
>>
>> (A)(i) that a professional review action has been proposed to be
>> taken against the physician,
>> (ii) reasons for the proposed action,
>>
>> (B)(i) that the physician has the right to request a hearing on the
>> proposed action,
>> (ii) any time limit (of not less than 30 days) within which to
>> request such a hearing, and
>>
>> (C) a summary of the rights in the hearing . . . .

§ 11112(b)(1). Thus, to undermine the presumption of compliance in the review, the Plaintiff must

show that a reasonable jury could find by the preponderance of the evidence that the notice given:

was not fair to the Plaintiff under the circumstances, § 11112(b)(3); was not consistent with the notice requirements of the "safe harbor" provision, § 11112(b)(1); and was not consistent with the notice required in light of any voluntary waivers of notice the Plaintiff might have made, § 11112(b).

As an initial matter the Court notes that the first suspension, which started May 24, 2001, is excluded from the requirements of § 11112(a)(3) because the suspension was fourteen days or less and taken during a period in which an investigation was being conducted. See 42 U.S.C. § 11112(c)(1)(B).

Looking to the second suspension, on November 11, 2004, BMH sent the Plaintiff a letter explaining that the MEC had concluded that a twenty-nine day suspension of the Plaintiff's privileges was necessary and would begin November 22, 2004. [Doc. 80-3 at 86]. However, in the November 11, 2004 letter, BMH notes that the suspension is "in accordance with the February 7, 2002 letter."

Clearly, less than thirty days passed between the letter to the Plaintiff on November 11, 2004, and the effective date of the suspension, November 22, 2004; thus, this suspension falls outside the "safe harbor" provision. However, the February 7, 2002, letter, which stated that the Plaintiff had received his last chance to avoid a twenty-nine day suspension, arguably gave fair notice of the suspension, even though two years passed in the interim. Further, the BMH Credentials Manual, which the Plaintiff agreed would govern his privileges, holds that thirty days notice and hearings on recommendations are only required where a suspension is thirty days or greater, see Credentials Manual §§ 4.B.1-B.3.

Based on the foregoing, the Court finds that the Plaintiff has failed to prove that a reasonable jury would find, by a preponderance of the evidence, that the notice afforded to him prior to the

22

second suspension was not fair under the circumstances. Although a reasonable jury might disregard the warning in the February 2007 letter because of the time that had passed and thereby find that the time allotted between the notice and effective date of the suspension was less than thirty days, the record of consistent and thorough correspondence and communication between BMH and the Plaintiff demonstrates that the notice afforded to the Plaintiff was fair under the circumstances.

In making its decision, the Court looks to the Court of Appeals for the Fourth Circuit's decision in Wieters v. Roper Hosp., Inc., 58 Fed. Appx. 40 (4th Cir. 2003), a case factually similar to the instant case in which the plaintiff physician voiced his dissatisfaction with hospital policies in a disruptive manner and eventually his privileges were revoked. In Wieters, the district court granted summary judgment even though the notice given to the physician did not comply with the § 11112(b) safe harbor provision and strayed from the letter of the hospital's bylaws because the court found immunity was appropriate since the notice had been fair to the physician under the circumstances. Despite the physicians' arguments that he never received a hearing prior to being placed on probation, that the bylaws were not complied with, and that competitors were on the ad hoc committee that considered the allegations against him, the Court of Appeals found that he had "presented nothing that would lead a reasonable jury to find by a preponderance of the evidence that the hospital treated him unfairly under the circumstances." Id. at 46.

The final suspension of the Plaintiff's privileges was a precautionary immediate suspension beginning March 3, 2005. A letter from Mr. Dawson on behalf of BMH dated February 24, 2005, was sent to the Plaintiff via certified mail and gave the Plaintiff notice both that the MEC had recommended that his privileges be revoked and that in light of the seriousness of the allegations a precautionary suspension would begin March 3, 2005, and would remain in effect until peer review

in the matter was completed. The Plaintiff was given notice in the letter that he was entitled to a hearing should he request one within thirty days. [Doc. 80-3 at 112].

The Plaintiff must prove that a reasonable jury may find, by a preponderance of the evidence, that this immediate suspension did not fall within the statutory provision which exempts "an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, [from the requirements of § 11112(a)(3)] where the failure to take such an action may result in an imminent danger to the health of any individual," 42 U.S.C. § 11112(c)(2).

The Court finds that the Plaintiff has failed to show, by the preponderance of the evidence, that a reasonable jury could find that the immediate suspension was inappropriate. The Plaintiff cites only to an acknowledgment by Ms. Liddi Berry, a supervisory nurse, that she did not recall Plaintiff's behavior causing actual physical injuries. However, the Plaintiff's reliance on this evidence is misplaced because the applicable standard requires that the physician's continued practice "may result in an imminent danger," not that it has previously resulted in physical injury.

The Court finds that a reasonable jury could not find, by a preponderance of the evidence, that BMH did not have a reasonable belief that the Plaintiff's continued practice could "result in an imminent danger." As noted above, an investigative committee had been formed to address the continuing issues with the Plaintiff. It submitted a summary report on February 11, 2009, to the MEC, and based upon this report, the MEC made the recommendation for an immediate suspension. In its report, the investigative committee discussed the Plaintiff's lack of communication with the nursing staff, his refusal to order HIV screenings for his patients in accordance with BMH policy, his late-scheduling of dialysis, and his availability in response to pages. [Doc. 80-3 at 110-11].

24

These concerns—especially those relating to the Plaintiff's refusal to communicate with or respond to the pages of the nurses who are charged with effectuating patient care—present a danger that patients' vital needs may go unaddressed. Thus, the Court finds that the procedures referred to in § 11112(a)(3) are met, because the failure to take such action may have resulted in an imminent danger to the health of patients, § 11112(c)(2).

Finally, in regards to the revocation recommendation, the Court finds that the notice given to the Defendant was consistent with the timing requirements for notice under the "safe harbor" provision, § 11112(b)(1). The fair hearing did not take place until August 30, 2005, approximately six months after the February 24, 2005, letter from Mr. Dawson. Thus, the notice gave more than the thirty days required by the safe harbor provision.

However, Plaintiff contends that the notice is not adequate because it states that the reasons for the MEC's recommendation were discussed at the meeting between the Investigating Committee and the Plaintiff and does not specifically list the concerns beyond noting that there were, "multiple violations of hospital policy, a pattern of inappropriate conduct, and [a] failure of all previous collegial, educational, and disciplinary actions to correct these problems." [Doc. 80-3 at 112].

Even assuming the notice falls outside the safe harbor provision because of the content deficiencies alleged by the Plaintiff, the Court finds that the Plaintiff has not shown that a reasonable jury could find, by a preponderance of the evidence, that the notice was not fair under the circumstances. On February 8, 2005, the Plaintiff was given a written memorandum outlining eight specific issues and subissues that the Investigating Committee would take up at the February 11, 2005, meeting [Doc. 80-3 at 109], and the report from that meeting indicates that those issues were discussed with the Plaintiff one-by-one. [Doc. 80-3 at 110-11]. Approximately two weeks after the

meeting with the Investigating Committee, the Plaintiff received the letter from Mr. Dawson specifically referencing the discussion at the meeting as the grounds for the MEC's recommendation. The Plaintiff has presented no evidence which would support finding that he was unaware of the MEC's bases for recommending revocation and did not receive adequate notice. Accordingly, the Court finds that the Plaintiff has not shown that a reasonable jury could find, by a preponderance of the evidence, that the notice was not fair under the circumstances.[4]

ii.      An Adequate Hearing

In addition to adequate notice, § 11112(a)(3) requires that the Plaintiff be afforded adequate hearing procedures that are fair to the physician under the circumstances. As with the notice requirement under § 11112(a)(3), a safe harbor provision is included in the statute. This provision deems a hearing to be adequate so long as it was conducted, ". . . before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved" and the physician was afforded the right to: representation by an attorney or other person of the physician's choice; have a record made of the proceedings; call, examine, and cross-examine witnesses; to present relevant evidence, regardless of its admissibility in a court of law; submit a written statement at the close of the hearing; and receive a written recommendation from the Panel along with its basis and a written decision from the health care entity.

In the instant case, the Court finds that the Plaintiff was afforded adequate hearing procedures which were fair under the circumstances prior to each of his suspensions. The record

---

[4]The Plaintiff also takes issue with the notice accorded by a May 26, 2005, letter which references the February 24, 2005, letter as containing the reasons for the recommendation. Because the Court finds the notice of the February 24, 2005, letter gave adequate notice that was fair under the circumstances, it also finds the May 26, 2005, letter gave adequate notice that was fair under the circumstances.

shows that, prior to each of his suspensions, BMH met with the Plaintiff to discuss the alleged violations of hospital policy and inappropriate professional behavior. BMH also facilitated numerous additional meetings with the BMH administration, medical staff leaders, and colleagues to convey hospital policy, the requirements contained in the Credentials Manual, and the gravity of the alleged violations.

When revocation of the Plaintiff's privileges was finally recommended, BMH conducted a fair hearing that complied with the safe harbor provision. Plaintiff was permitted to call witnesses and to cross-examine witnesses presented by BMH. He was also allowed to present exhibits, regardless of their admissibility under rules of evidence, and was supplied with a witness list, witness summaries, and all pertinent documentation prior to the hearing. The Plaintiff argues that he was not able to cross-examine the majority of the employees who lodged complaints against him. A review of the record shows that the Plaintiff was not prevented from cross-examining witnesses who were called against him, but rather, a number of witnesses who he hoped would have been available were not. The prehearing correspondence between counsel indicates that BMH did not prevent the Plaintiff from calling this witnesses or disregard any requests from the Plaintiff that he be put in touch with necessary witnesses. [See Docs. 81-11 to 81-15].

The Plaintiff also takes issue with the documentary evidence presented at the hearing. First, he argues that the Panel's decision to admit his entire quality file at the fair hearing undermined the adequacy of the hearing because it contained numerous documents that were unrelated to the issues to be addressed at the fair hearing. The Plaintiff has filed the entire quality file with the Court, without pointing to any documents that specifically rebut the presumption that the fair hearing was conducted within the perimeters of HCQIA. The Court finds that while the quality file may have

27

included unnecessary information, it did not detract from the pertinent issues in a way that would lead a reasonable jury to conclude the Plaintiff's hearing was not fair under the circumstances.

The Plaintiff also contends that the fair hearing was not adequate and fair because Dr. Pittenger, a physician who served on the Fair Hearing Panel, had attended a prior meeting about issues in the dialysis unit. Dr. Pittenger attended a meeting of the BMH Department of Medicine on August 4, 2004, which the minutes indicate was a standard monthly meeting. The meeting undertook regular business—a review of the previous meeting's minutes, a chairman's report that addressed budget issues and a review of serum potassium levels at BMH, a renewal of the privileges of the family practice and dermatology privileges—and the Plaintiff made a presentation of the issues with BMH contracting with ETI for dialysis services. [Doc. 80-3 at 83-84]. Eighteen medical staff members were present at the meeting, which lasted approximately an hour and twenty minutes. [Doc. 80-3 at 83-84]. The Court finds that the Plaintiff has presented no evidence that a reasonable jury would find, by the preponderance of the evidence, that Dr. Pittenger's participation in a routine meeting—where the Plaintiff choose to make a presentation about a hospital policy and his behavior issues were not addressed—would so intertwine him in the issues presented by the Plaintiff's professional misbehavior that the Plaintiff would be denied a fair and adequate hearing under the circumstances.

d.   Reasonable Belief That the Action Was Warranted By the Facts Known After a Reasonable Effort to Obtain Facts and After Adequate Notice and Hearing

After examining the first three prongs of § 11112(a), the Court must consider the fourth prong, § 11112(a)(4), which closely tracks the analysis of § 11112(a)(1). Meyers, 341 F.3d at 471. The fourth prong of § 11112(a) is satisfied if the professional review action was taken in the reasonable belief that it was warranted by the facts known after such reasonable effort to obtain facts and after given adequate notice and hearing. To rebut the presumption of compliance, the Plaintiff must show that the facts presented to BMH were "so obviously mistaken or inadequate as to make reliance on them unreasonable." Id. (quoting Mathews v. Lancaster Gen. Hosp., 87 F.3d 624 (3d 1996)). A showing that the MEC or Board of Directors reached an incorrect conclusion is insufficient.

As more fully explained above, BMH was articulate and thorough at each step of its review step. BMH had colleagues and administrators address the concerns and complaints that were alleged, and met with the Defendant on numerous occasions both in an investigatory capacity and in attempting to prevent a full-blown investigation. BMH followed up after each meeting with written correspondence to ensure that the Plaintiff understood the issues that were to be addressed going forward. Faced with the volumnious evidence of BMH's consistent and comprehensive efforts and without evidence to undermine the effectiveness of these efforts, a reasonable jury could not find, by a preponderance of the evidence, that the action was not warranted by the facts known to BMH.

3. The Plaintiff Cannot Overcome the Rebuttable Presumption that BMH's Actions Complied with Relevant Standards

Based on the foregoing, the Court finds that the Plaintiff has failed to show that the professional review action taken by BMH falls outside the protection afforded by the HCQIA. Therefore, BMH "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to [the peer review action of the Plaintiff]." Accordingly, Defendant BMH's Motion for Summary Judgment will be **GRANTED in part** and Claim Three of the Amended Complaint will be **DISMISSED with prejudice**.

B.     **Tennessee Peer Review Statute and Substantial Compliance**

Because BMH's Motion for Summary Judgment will be granted as to Count Three, analysis of BMH's alternative grounds for summary judgment based upon the Tennessee Peer Review Statute and its substantial compliance with its contractual obligations is not necessary.

C.     **First Amendment Retaliation Claim**

Neither the HCQIA nor the Tennessee Peer Review Statute are grounds for immunity from the Plaintiff's constitutional claims. Thus, the Court will address the merits of BMH's Motion for Summary Judgment on each of the Plaintiff's constitutional claims according to the regular summary judgment standard discussed.

First, the Plaintiff claims that he spoke out on a matter of public concern regarding the management and operation of the dialysis unit at BMH, a public hospital, and he maintains that his speech on this matter was constitutionally protected speech. The Plaintiff argues that his complaints and requests for change in the operation of the dialysis unit were the substantial motivating factor for the eventual revocation of his privileges. Thus, the Plaintiff maintains that BMH retaliated

30

against him based upon constitutionally protected speech in violation of 42 U.S.C. § 1983. [Doc. 68 at ¶¶ 49-57].

All First Amendment retaliation claims are analyzed under the same framework. See Thaddeus-X v. Blatter, 175 F.3d 378, 390 (6th Cir.1999). A person who has been subjected to an adverse action in retaliation for exercising his First Amendment rights must prove three elements to establish a claim: (1) that he engaged in a constitutionally protected activity; (2) that an adverse action was taken against him by the defendant that would likely chill a person of ordinary firmness from continuing to engage in the constitutionally protected activity; and (3) that the adverse action was motivated at least in part as a response to his exercise of a constitutionally protected right. Id.

A plaintiff claiming retaliation for exercising a constitutional right must first show that he was engaged in constitutionally protected activity. Thaddeus-X, 175 F.3d at 390. Citizens' rights to free speech and free association are protected from government regulation by the First Amendment to the United States Constitution. However, because of the special role of the government as an employer, it is granted some leeway to regulate its employees' speech and association. See Scarbrough v. Morgan County Bd. of Educ., 470 F.3d 250, 255 (6th Cir. 2006). Thus, when the plaintiff is a public employee who is claiming retaliation by his employer, the government, the plaintiff's speech and association is protected only if (1) it touches on a matter of public concern and (2) there is no overriding state interest that would be undermined by the employee's speech or association. See Connick v. Myers, 461 U.S. 138 (1983); Scarbrough, 470 F.3d at 255; Boals v. Gray, 775 F.3d 686, 692 (6th Cir.1985). Whether speech is a matter of public concern is a question of law to be decided by the Court. Chappel v. Montgomery County Fire Prot. Dist. No. 1, 131 F.3d 564, 574 (6th Cir. 1997). If the public employee's activity "does not involve

a matter of public concern, then it does not warrant First Amendment protection and the Court's inquiry is over" and the Court need not consider the other elements of the claim. Zerman v. City of Strongsville, No. 1:04-CV-2493, 2006 WL 2812173, at * 11 (N.D.Ohio Sept.28, 2006).

Generally, a matter of public concern is a "matter of political, social, or other concern to the community." Jackson v. Leighton, 168 F.3d 903, 909 (6th Cir. 1999) (quoting Connick, 461 U.S. at 146). "It is important, however, to distinguish matters of public concern from internal office politics." Jackson, 168 F.3d at 909. "The mere fact that public monies and government efficiency are related to the subject of a public employee's speech do[es] not, by [itself], qualify that speech as being addressed to a matter of public concern." Id. at 909-10 (quoting Barnes v. McDowell, 848 F.2d 725, 734 (6th Cir.1988)).

The Plaintiff cites the Court to Braswell v. Haywood Regional Medical Center., 352 F. Supp. 2d 639 (W.D.N.C. 2005), a case in which the district court found that a surgeon's discouraging another surgeon from accepting employment in the region was a public concern. However, the Court finds Braswell to be factually distinguishable from the instant case. In Braswell, the plaintiff physician wrote a letter explaining that if the surgeon affiliated with the hospital, the county's surgeon population would exceed North Carolina's surgeon population density recommendations. Id. at 643. The Plaintiff in this case has stated only that his efforts were to improve the safe and effective operation of the hospital's dialysis unit. Unlike the physician in Braswell whose efforts sought to keep the population within limits suggested by the legislature, or the medical board on behalf of the legislature, with the public interest in mind, the Plaintiff here has not cited any regulations meant to improve the public's health or well-being which were being violated by ETI.

The Court finds the Court of Appeals for the Sixth Circuit's decision in Jackson v. Leighton,

168 F.3d 903 (6th 1999), to be analogous and controlling. In <u>Jackson</u>, the court found that speech by the chairman of the Department of Orthopedic Surgery at the Medical College of Ohio regarding a merger, which would put the teaching institution's survival in danger, constituted a matter of public concern. <u>Id.</u> at 910. However, when the merger failed to go through, the same chairman spoke out against a proposed contract to allow Toledo Hospital to run the pediatrics unit at the college, and the court found this speech did not address a matter of public concern. <u>Id.</u> at 910. The court upheld the district court's granting of summary judgment reasoning that there was nothing in the record which indicated that the competitor's proposal would threaten provision of care in the locality and, further, classified the dispute as "another example of the 'the quintessential employee beef' of incompetent management." <u>Id.</u> at 910-11 (quoting <u>Barnes</u>, 848 F.2d at 735).

As in <u>Jackson</u>, the Court has before it a case of a dispute with management. The Plaintiff has cited no authority indicating that contracting with ETI to provide the dialysis services at BMH endangered the mission of BMH to provide competent, medical service to Blount County. Because the Plaintiff's criticisms of the dialysis contract involved administrative issues rather than political, social, or economic concerns affecting the local community, his speech on the issue was not a public concern. <u>See Jackson</u>, 168 F.3d at 911.

The Court finds that there is no genuine issue as to material fact and that BMH is entitled to judgment as a matter of law because the Plaintiff's speech did not address a matter of public concern and therefore cannot serve as the basis for First Amendment retaliation claim. Accordingly, Defendant BMH's Motion for Summary Judgment will **GRANTED in part** and Claim One of the Amended Complaint will be **DISMISSED with prejudice**.

**D.     Violation of Procedural Due Process**

Finally, the Plaintiff maintains that his privileges to practice medicine at BMH constitute a property interest under the Fourteenth Amendment to the United States Constitution and were wrongfully suspended and revoked in violation of the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.  Specifically, the Plaintiff claims that the revocation of his privileges was wrongful because: the standards contained in the Credentials Manual were impermissibly vague and overbroad and created an unfair burden of proof; he received inadequate notice; he was not given a sufficient opportunity to confront witnesses against him because hearsay was admitted at his hearing; and the Panel was biased against him and was not independent. [Doc. 68 at ¶¶ 58-62].

The Due Process Clause of the Fourteenth Amendment provides that "no State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV.  Title 42, section 1983 of the United States Code enforces this constitutional guarantee by providing that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."

Analysis of a due process claim is conducted in two steps.  A court must first determine whether a plaintiff has a liberty or property interest entitled to due process protection.  Bd. Of Curators v. Horowitz, 435 U.S. 78, 82 (1978).  If a plaintiff has a protected liberty or property interest, a court must then determine whether the plaintiff was provided sufficient notice and "the

34

opportunity to be heard at a meaningful time and in a meaningful manner." <u>Mathews v. Eldridge,</u>

424 U.S. 319, 333 (1976) (internal quotation marks omitted) (quoting <u>Armstrong v. Manzo</u>, 380 U.S.

545, 552 (1965)).

At the first step of the analysis, BMH does not dispute that the Plaintiff's medical privileges

constitute a liberty or property interest which is entitled to due process protection, and the Court

finds that the Plaintiff's privileges are a property interest entitled to due process protection.

BMH maintains that the Plaintiff has been given "the opportunity to be heard at a meaningful

time and in a meaningful manner," <u>Mathews</u>, 424 U.S. at 333, and therefore, no due process

violation occurred. The Plaintiff argues that he was denied due process when his privileges were

suspended and revoked. In the Amended Complaint, the Plaintiff identified four grounds for finding

a due process violation: vague and overbroad standards which created an unfair burden of proof,

inadequate notice, denial of confrontation of witnesses, and the Panel's bias against him. [Doc. 68

at ¶ 59]. In his response to BMH's motion, the Plaintiff expands considerably upon these grounds

adding a number of arguments that the Investigating Committee review denied him due process.

[Doc. 88 at 10-25].

1.      *Vague and Overbroad Standards Which Created an Unfair Burden of Proof*

The Amended Complaint alleges that vague and overbroad standards in the Credentials

Manual created an unfair burden upon the Plaintiff. In his response to BMH's motion, the

Defendant has specified this argument to address the "orderly operation" clause contained in Section

3.D.1 of the Credentials Manual.

As previously noted, on November 10, 2004, the Plaintiff, Dr. Weatherbee, and Dr. Coleman

met to discuss recent problems and concerns, and the next day, Dr. Weatherbee sent the Plaintiff a

letter summarizing the discussions from the meeting and stating that the MEC had concluded that a twenty-nine day suspension of the Plaintiff's privileges was necessary. The Plaintiff argues that BMH applied Section 3.D.1 of the Credentials Manual when it made this determination. Specifically, the Plaintiff alleges that the MEC applied a portion of 3.D.1 which allows immediate suspension of clinical privileges where failure to take such action "may interfere with the orderly operations of the hospital."

The Plaintiff has presented no evidence that the MEC relied on this particular portion of Section 3.D.1. The section provides multiple grounds for suspension. Specifically, the section provides suspension is appropriate whenever failure to take such action may (1) "result in an imminent danger to the health and/or safety of any individual" or (2) "may interfere with the orderly operation of the hospital." However, even if BMH did rely on the later portion Section 3.D.1, the Court finds no evidence to support the Plaintiff's claim that such reliance denied him a meaningful opportunity to be heard, as Dr. Weatherbee and the physicians met with the Plaintiff and gave him an opportunity to rebut their specific concerns. Further, the Court notes that the Plaintiff agreed to the terms and conditions of the Credential Manual including Section 3.D.1.

The Plaintiff also maintains that Section 4.D.2(a) violated his constitutional due process right because it instructs that "the Hearing Panel shall recommend in favor of the Medical Executive Committee . . . unless it finds that the affected individual has proved by a preponderance of the evidence that the unfavorable recommendation was arbitrary and capricious."

The Plaintiff omits subsection (b) of Section 4.D.2(b), which works in tandem with the above portion of the article, and instructs:

> The recommendation of the Hearing Panel shall be based on the
> evidence produced at the hearing.

36

This evidence may consist of the following:

> (1) oral testimony of witnesses;
>
> (2) memorandum of points and authorities presented in connection with the hearing;
>
> (3) any information regarding the individual who requested the hearing so long as the information has been admitted into evidence at the hearing and the person who requested the hearing had the opportunity to comment on and, by other evidence, refute it;
>
> (4) any and all applications, references, and accompanying documents;
>
> (5) other documentary evidence, including medical records; and
>
> (6) any other evidence that has been admitted.

[Doc. 81-1 at 21].

Looking at Section 4.D.2 as a whole and in conjunction with the evidence in record that the Plaintiff was allowed to present evidence and witnesses to the Panel, the Court finds that no evidence to support the Plaintiff's claim that operation under Section 4.D.2 denied the Plaintiff a meaningful opportunity to be heard.

2.    *Confrontation of Witnesses*

In the Amended Complaint [Doc. 68], the Plaintiff contends that his constitutional right to due process was violated because hearsay testimony was admitted at the fair hearing and he was unable to cross-examine or confront the persons who spoke the hearsay.

Section 4.C.6 states that the fair hearing "shall not be conducted according to rules of evidence.  Hearsay evidence shall not be excluded merely because it constitutes hearsay.  Any

relevant evidence shall be admitted if it is the sort of evidence on which responsible people are accustomed to rely in the conduct of serious affairs."

The evidence of record supports the Plaintiff's claim that hearsay evidence was admitted at the fair hearing. However, the Court cannot find that the admission of hearsay evidence, where the Plaintiff was given the opportunity to call as witnesses those who spoke the hearsay, denied him his right to confront witnesses. Both parties were allowed to introduce hearsay evidence. For example, BMH objected to hearsay evidence presented by the Plaintiff, but the Plaintiff advocated the evidence's introduction despite its being hearsay. [Fair Hrg. Trans. Day I, vol. I at 360-62]. Further, the Plaintiff was allowed to present his concerns about the reliability of the hearsay presented in the presence of the Panel, and Mr. Knolton, the presiding panelist, gave instructions on the record about discounting the weight of such evidence. [Fair Hrg. Trans. Day I, vol. I at 73-79].

3.      *Bias of the Panel*

The Plaintiff also alleges that certain members of both the Investigating Committee (Dr. Milhollin and Dr. Beard) and the Fair Hearing Panel (Dr. Pittenger, Dr. Slater, and Dr. Brewer) were biased against him. The Plaintiff argues that each of the above listed doctors has a bias in favor of BMH or against the Plaintiff—Dr. Beard because of his prior involvement in the case; Dr. Weaterbee because he initially selected a doctor with prior involvement in the matter to be on the Panel; Dr. Pittenger because of a lessor-lessee relationship he had with BMH and the previous involvement in the matter examined more fully above; Dr. Milhollin because he is in Dr. Pittenger's medical group. In addition, the Plaintiff alleges an overarching social bias amongst and between the hospital and the doctors based upon social connections including children's soccer teams, birthday parties, wives' relationships, and University of Tennessee football tickets.

The Court of Appeals for the Sixth Circuit has consistently held that such attenuated allegations of bias are not sufficient to support finding a violation of due process. See Yashon v. Hunt, 825 F.2d 1016, 1026 (6th Cir. 1987); Benjamin v. Brachman, 246 Fed. Appx. (Table) (6th Cir. Aug. 8, 2007).

In regards to the Investigating Committee, the Plaintiff argues that the inclusion of Dr. Beard deprived him of a fair hearing because Dr. Beard had prior knowledge of the history of complaints about the Plaintiff's behavior and the collegial efforts and administrative meetings that had been conducted to address the issues. Dr. Beard testified in his deposition that when he began sitting on the Investigating Committee almost two years had passed since his tenure as Chief of Staff and since he had last dealt with issues regarding the Plaintiff. While he recognized that his prior history might be an issue, Dr. Beard stated that he came into the hearing "totally open handed," [Beard depo. at 144]. The Court finds that Dr. Beard's involvement with the preliminary behavior issues years before he was assigned to the Investigating Committee cannot be said to have denied the Plaintiff an opportunity to be heard. No evidence has been presented to undermine Dr. Beard's testimony that he investigated the merits of the complaints in a fair and even-handed manner, and the Investigating Committee's findings were reviewed by the MEC before any action was taken on them.

Looking at the Fair Hearing Panel, the Court previously found that Dr. Pittenger's involvement in a meeting of the Department of Medicine at which the Plaintiff made a presentation did not exclude him from inclusion on the Panel. The lessee-lessor relationship between BMH and Dr. Pittenger does not present a conflict of interest sufficient to find that the Plaintiff was denied an opportunity to be heard. Further, the Court notes that the Credentials Manual provides that a

contractual relationship with BMH does not preclude an individual from serving as a member of a Fair Hearing Panel. [See Doc. 81-1 at 15]. Similarly, the Court finds that the social connections cited by the Plaintiff are typical of any community and that the Plaintiff's allegations that such minor and speculative connections would bias members of the Panel is not sufficient to support finding a violation of due process.

4.      *Adequate Notice*

The Plaintiff also contends that BMH did not give him adequate notice of the grounds for removal of his privileges. The Court previously analyzed the sufficiency of the notice given to the Plaintiff under the HCQIA standard, which imposed the burden of proof on the Plaintiff. While BMH bears the burden of proof when the Court determines whether the Plaintiff's constitutional claims should survive the motion for summary judgment, the Court's analysis relies upon the evidence previously reviewed above.

Prior to his first suspension, the Plaintiff received two written notice of the behavior issues and violations of hospital policy that had been complained of, and hospital administrators aired their concerns and heard the Plaintiff's prospective at meetings to address the issues raised. Prior to his second suspension, the Plaintiff met with medical staff leaders to discuss the issues raised by the dialysis nurses and other hospital staff.

Prior to the third and immediate suspension of his privileges, the Plaintiff was given a written memorandum outlining eight specific issues and subissues that the Investigating Committee would take up [Doc. 80-3 at 109], and those issues were discussed with the Plaintiff one-by-one by the Investigating Committee at the meeting that followed. [Doc. 80-3 at 110-11]. Approximately two weeks after the meeting with the Investigating Committee, the Plaintiff received the letter from Mr.

Dawson specifically referencing the discussion at the meeting as the grounds for the MEC's recommendation.

Finally, prior to the revocation of his privileges, the Plaintiff received a fair hearing on August 30, 31, and September 1, 2005, at which the Plaintiff was represented by counsel and from which a written opinion was issued outlining the Panel's decision and reasoning. An appeals hearing was then held before the BMH Board of Directors and again the charges against the Plaintiff were reviewed. Each party was represented by counsel on appeal and each submitted a written statement of their position.

The Plaintiff has presented no evidence which would support finding that he was unaware of the MEC, the Investigating Committee, or the Panel's bases for recommending revocation. The Plaintiff's bare allegation that BMH did not provide adequate notice is not sufficient to support finding that the Plaintiff was denied his opportunity to be heard or for finding a violation of his right to due process.

5.    *Deficiencies in the Investigation*

Finally, the Plaintiff has included in his response to BMH's motion, an allegation that "the investigating committee engaged in a one-sided and shoddy investigation" of the Plaintiff. [Doc. 88 at 12]. Plaintiff alleges that the Investigating Committee should have conducted additional interviews, should have reviewed medical charts, and should have engaged an outside reviewer. [Doc. 88 at 12-17]. These allegations are not contained in the pleadings, and thus, BMH is not charged with showing the lack of genuine issue of material fact in regards to these issues. Nonetheless, looking at the allegations and evidence of record, the Court finds that even if it were to consider the substance of these allegations, they do not demonstrate that the Plaintiff was denied

41

an opportunity to be heard and therefore cannot support finding a violation of the Plaintiff's right to due process.

Based on the foregoing, the Court concludes a fair-minded jury could not return a verdict in favor of the Plaintiff on his procedural due process claim. After reviewing the record, the Court finds that BMH completed a thorough review and hearing procedure before suspending or, ultimately, revoking the Plaintiff's privileges. Further, the Plaintiff admitted in his deposition that he felt he was given an opportunity to explain his side of the story. [Hatab depo. at 85-86]. The Court finds that the Plaintiff was afforded proper notice and an opportunity to be heard at a meaningful time and in a meaningful manner. No genuine issue of material fact remains as to this claim and BMH is entitled to a judgment as a matter of law.

Accordingly, Defendant BMH's Motion for Summary Judgment is **GRANTED in part** and Claim Two of the Amended Complaint shall be **DISMISSED with prejudice**.

## IV.      CONCLUSION

The Court finds that no genuine issue as to material facts exist as to Plaintiff Mazen Abu-Hatab's claims for relief against Defendant Blount Memorial Hospital, Inc., under 42 U.S.C. § 1983 and under Tennessee common law. The Court further finds that Defendant Blount Memorial Hospital, Inc., is entitled to judgment as a matter of law on all claims against it. Accordingly, an order **DISMISSING** Claims **One, Two, and Three** in the Amended Complaint **[Doc. 68]** and **GRANTING** BMH's Motion for Summary Judgment **[Doc. 77]** shall follow.

**ORDER ACCORDINGLY**.

ENTER:

s/ H. Bruce Guyton
United States Magistrate Judge

42